**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No.: 1:22-cr-184-DLF** |
|  | : |  |
| **v.** | : |  |
|  | : |  |
| **BARRY BENNET RAMEY,** | : |  |
|  | : |  |
| **Defendant.** | : |  |
|  | : |  |

<u>**UNITED STATES'S TRIAL BRIEF**</u>

The United States, by and through its attorneys, respectfully submits this brief summarizing the government's evidence at trial and various legal issues likely to be brought before the Court. As described below, the government will introduce video evidence and testimony from law enforcement witnesses, including the two victims of the assaults charged in the Indictment. In an effort to streamline its presentation and focus on the matters in dispute, the parties have agreed to certain stipulations.

**I.      THE JANUARY 6 CAPITOL RIOT AND THE DEFENDANT'S ACTIONS**

On January 6, 2021, thousands of people descended on the U.S. Capitol building and grounds when a joint session of Congress had convened to certify the votes of the Electoral College for the 2020 Presidential Election. Vice President Michael R. Pence, as the President of the Senate, was at the Capitol to preside over the Joint Session and, later, the Senate proceedings. At all relevant times, the United States Capitol building and its grounds—including the Lower West Terrace, the Upper West Terrace, and the plaza on the East Side of the Capitol—were closed to members of the public. On that day, the perimeter of the restricted area was visually marked by physical barriers surrounding the U.S. Capitol building and grounds, baring large signs that said, "AREA CLOSED BY ORDER OF THE UNITED STATES CAPITOL POLICE BOARD."

Physical barriers included metal "bike rack" barricades and green plastic snow fencing.  United States Capitol Police (USCP) officers were stationed around the grounds and guarded the perimeter.

The first breach of the outer perimeter occurred at approximately 12:53 p.m. at an area known as Peace Circle, located at the Northwest corner of Capitol grounds.  After breaking through the barrier of bike rack and snow fencing, mowing down USCP in the process, rioters flooded into the restricted area—down Pennsylvania Walkway and the West Lawn—and towards the Capitol building.  On their way, the crowd broke through multiple intermediate barriers, including additional snow fencing on the west lawn baring "AREA CLOSED" signs and metal fencing erected around the Inaugural Stage in the Lower West Terrace.  The crowd forced USCP to successively retreat, ultimately surrounding the officers in the Lower West Terrace.  During the ensuing standoff, which lasted for approximately 40 minutes, the crowd screamed, chanted, and threw projectiles at officers.  They showed no signs of turning back or that they were content to stay in the Lower West Terrace.  USCP deployed less-than-lethal crowd control ordinance in an effort to disperse the mob, to no avail.

The defendant, Barry Bennet Ramey, entered the restricted Capitol grounds around 1:00 p.m., shortly after the first breach at Peace Circle.  Ramey was wearing, among other things, knee pads, black armored motorcycle gloves, a blue and white neck gator with an American flag pattern, and he was carrying a black backpack.  At times, he wore a black gas mask.  Upon reaching the Lower West Terrace, Ramey situated himself on the Northwest side of the terrace, near a set of stairs covered by scaffolding and leading to the Upper West Terrace ("the Senate Stairs").  There, Ramey chanted with the crowd, yelled at police, and intermittently donned and removed a large black gas mask as police deployed crowd control ordinance.

At some point between 1:30 and 1:40 p.m., the crowd turned its attention toward an opening in the scaffolding at the base of the Senate Stairs, which led to the Upper West Terrace.  Up to that point, additional bike rack barriers stood between the Lower West Terrace and the scaffolding, and a thin line of USCP guarded this area as the crowd's intensity increased.  One of these officers was Officer Bryant Williams, who arrived in the area after hearing a call on the radio that Peace Circle and the west lawn had been breached.  Officer Williams had been on motor patrol that day and was wearing a blue motorcycle helmet along with his USCP uniform.

Around the time that the crowd began to focus on the Senate Stairs, Officer David Riggleman arrived, wearing a baseball cap and a white face mask, and found himself standing next to Officer Williams near the base of the Senate Stairs.  Ramey stood within feet of Officers Riggleman and Williams, and in close proximity to the bike rack barriers that stood in front of the scaffolding.

At approximately 1:42 p.m., the crowd began to push forward.  As this happened, Ramey lifted his right arm.  In his hand, he held a cannister about the length of his palm with a black cap. Ramey briefly turned his hand towards his own face, apparently checking to make sure the cannister was ready to fire, then he extended his right arm and sprayed.  This spray hit Officer Riggleman directly in the eyes.  Officer Riggleman reacted immediately, turning away from the surging crowd and protecting his service weapon.  Officer Riggleman experienced a sensation of sand in his eyes and was no longer able to keep his eyes open.  Officer Riggleman used a railing on the stairs to guide him back to the building, where he sought assistance from another officer to get to a bathroom so that he could decontaminate.



*Close up of Gov't Ex. 200A – spray (circled in white) of Ofc. Riggleman by Ramey*

Seconds after Ramey sprayed Officer Riggleman, Ramey extended his arm and sprayed again.  The second spray hit Officer Williams.  Because Officer Williams was wearing his motorcycle helmet, he did not react until the spray had seeped through the foam pad sitting on forehead and began dripping into his eyes.  Officer Williams did not have an opportunity to decontaminate until several hours later.  After being sprayed by Ramey, Officer Williams experienced blurred vision and color distortion.  He continues to experience vision problems.



*Close up of Gov't Ex. 200C – spray (circled in blue) of Ofc. Williams by Ramey*

Both Officers Riggleman and Williams knew immediately that they had been hit with OC spray or pepper spray.[1]  As part of their training, both officers were instructed how to use OC spray and were sprayed themselves during such training.  The officers will describe their experience of being sprayed as part of their training as compared with their experience of being sprayed on January 6.  The officers will testify that, while OC spray is considered a less-than-lethal weapon as used by law enforcement, depending on the circumstances and the person being sprayed, it can be extremely dangerous.  Moreover, the primary purpose of OC spray is to incapacitate the subject. In the circumstances under which Officers Riggleman and Williams were sprayed on January 6, their incapacitation could easily have become deadly, especially given that they were both armed.

---

[1]     The officers will testify that the substance that they refer to as "OC spray" is colloquially known as "pepper spray."  There are different brands of spray; "OC" and "pepper" spray are both generic terms.

After the breach of the line at the base of the Senate Stairs, the mob continued to push their way up the stairs.  After battling police under the scaffolding, rioters advanced to a landing in the middle of the stairs at approximately 2:09 p.m., then the Upper West Terrace, and ultimately breached the building itself.  The first interior breach of the Capitol building occurred at the Senate Wing Door, a direct shot from the Senate Stairs, at approximately 2:13 p.m.  At this time, both houses of Congress had suspended proceedings, and members and Congressional leadership, including the Vice President, were being evacuated from House and Senate Chambers.

After his assaults on Officers Riggleman and Williams—which contributed to the collapse of the police line at the Senate Stairs—Ramey watched and celebrated.  Standing near the opening in the scaffolding, he chanted and cheered with others around him who had participated in the assault.  Along with others around him, he raised his hands above his head, made an "ok" gesture with his hands, and clapped while he smiled in the direction of the stairs.  Later, after backing away from the scaffolding and stairs, Ramey watched the incursion on the stairs and recorded it with his cellphone, holding his gas mask in the crook of his arm.

Ramey remained on Capitol grounds for at least three more hours.  Ramey eventually made his way from the Lower to the Upper West Terrace around 4:00 p.m., where he remained at the outside of the Capitol building.  He and other remaining rioters on the Upper West Terrace were pushed out by a wall of police officers around 4:30 p.m., after which Ramey went around to the Eastside of the Capitol building.  But he did not leave.  Later, around 5:20 p.m., Ramey made his way back to the Lower West Terrace where he stood in the vicinity of the media tower, along with other rioters who refused to leave the restricted area as the grounds went dark.

Congress was not able to resume the Joint Session until every rioter had been cleared from Capitol grounds and multiple security sweeps determined that the building was safe and secure. Congress resumed its proceedings after 8:00 p.m.

For his conduct on January 6, 2021, the defendant is charged with violations of 18 U.S.C. §231 (a)(3) (impeding officers during a civil disorder), 18 U.S.C. §§ 111(a)(1) and (b) (assaulting officers using a deadly or dangerous weapon), 18 U.S.C §§ 1752(a)(1) and (b)(1)(A) (entering and remaining on restricted grounds with a deadly or dangerous weapon); 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (disruptive and disorderly conduct on restricted grounds with a deadly or dangerous weapon); 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (engaging in physical violence on restricted grounds with a deadly or dangerous weapon); and 40 U.S.C. § 5014(e)(2)(F) (act of physical violence in the Capitol grounds or buildings).

## II.      THE GOVERNMENT'S PROOF

To prove the elements of the charged offenses, the government will call four witnesses—USCP Captain Carneysha Mendoza, FBI Special Agent Ryan Nougaret, USCP Officer David Riggleman, and USCP Officer Bryant Williams.

### A.  Trial stipulations

The government and the defendant have reached stipulations to the following facts which all parties agree are not in dispute.   These stipulations include: (1) a description of the Capitol Building and Grounds (Ex. 501); (2) that the Certification of the Electoral College Vote was taking place on January 6, 2021, a timeline of the certification of the Electoral College Vote, and that the proceedings were disrupted (Ex. 502); (3) the operation and maintenance of closed-circuit video (CCTV) monitoring and recording equipment utilized by the USCP on January 6, 2021, and that the CCTV footage submitted by the government is authentic (Ex. 503); (4) the defendant's identity (Ex. 504); and (5) that the government's video exhibits obtained from open sources and other

Capitol breach subjects are authentic in that they are what they purport to be, that they fairly and accurately depict events on and near Capitol grounds on January 6 (Ex. 505).

### B.  Witness testimony and related exhibits

#### 1.  *USCP Captain Carneysha Mendoza*

To explain the timeline and progression of the riot from the breach at Peace Circle to the first interior breach of the Capitol building at the Senate Wing Door, the government will call United States Capitol Police Captain Carneysha Mendoza.  Video evidence will show what occurred as the Capitol grounds and building were breached.  Captain Mendoza will also testify that the Capitol building and grounds were restricted to the public on January 6, 2021, due to the pandemic and the presence of the Vice President.  With the aid of video and photograph exhibits, Captain Mendoza will testify as to the nature of the physical barriers marking the restricted area. Captain Mendoza will testify as to the disruption of government business, and that Congress could not resume its proceedings until every last rioter had been cleared from the grounds and multiple security sweeps had been conducted.  Captain Mendoza will testify as to acts of violence committed by two or more persons that caused damage to property and injury to persons on Capitol grounds.

#### 2.  *FBI SA Ryan Nougaret*

The government will present testimony from FBI Miami Field Office Special Agent Ryan Nougaret.  Agent Nougaret is the lead case agent investigating the defendant's conduct.  In the course of his investigation, Agent Nougaret has reviewed USCP CCTV footage, publicly available open-source video, and video obtained by the government throughout its broader investigation into the Capitol breach showing the defendant's conduct.  Agent Nougaret will testify as to significant aspects of the defendant's conduct captured by video, including the assault of Officers Riggleman

and Williams.   Agent Nougaret will also testify as to records obtained in the course of the investigation into the Capitol breach showing that the civil disorder at the Capitol impacted interstate commerce, causing Safeway stores in the D.C. area to close.

3.  *USCP Officer David Riggleman and USCP Officer Bryant Williams*

Officers Riggleman and Williams will testify about their experience being sprayed on January 6, 2021, and their experience as law enforcement officers defending the Capitol in the midst of the riot that day. They will also testify about their training and experience both in the use of OC spray as a law enforcement tool and in being sprayed as part of their training.   Both officers will describe how, on January 6, they were lawfully engaged in the performance of their official duties, and that the civil disorder—and Ramey, specifically—impeded and obstructed them during the performance of those duties and interfered with a federally protected function.

### III.    Elements of the Crimes Alleged

The Indictment charges Barry Ramey with one offense under 18 U.S.C. §231(a)(3); two offenses of 18 U.S.C. §§ 111(a)(1) and (b); one offense under 18 U.S.C §§ 1752(a)(1) and (b)(1)(A); one offense under 18 U.S.C. § 1752(a)(2) and (b)(1)(A); one offense under 18 U.S.C. § 1752(a)(4) and (b)(1)(A); and one offense under 40 U.S.C. § 5014(e)(2)(F).  The elements of those offenses as charged in the Indictment are as follows:[2]

### Count One: Impeding or Obstructing Officers During a Civil Disorder

Count One of the Indictment charges the defendant, Barry Ramey, with impeding or obstructing officers during a civil disorder, in violation of 18 U.S.C. § 231(a)(3).  In order to find

---

[2]     Instructions and elements are drawn from the instructions proposed by the court, *see* ECF 28, as modified following an amendment proposed by the government which was adopted by the Court.  ECF 35 and 37.

the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. the defendant knowingly committed an act or attempted to commit an act.

2. in committing or attempting to commit that act, the defendant intended to obstruct, impede, or interfere with one or more law enforcement officers.

3. at the time of the defendant's actual or attempted act, the law enforcement officer or officers were engaged in the lawful performance of their official duties incident to and during a civil disorder.

4. the civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident.

The term "civil disorder" means any public disturbance involving acts of violence by groups of three or more persons, which (a) causes an immediate danger of injury to another individual, (b) causes an immediate danger of damage to another individual's property, (c) results in injury to another individual, or (d) results in damage to another individual's property.

The term "commerce" means commerce or travel between one state, including the District of Columbia, and any other state, including the District of Columbia.  It also means commerce wholly within the District of Columbia.

The term "federally protected function" means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof.

The term "department" includes executive departments.   The Department of Homeland Security, which includes the United States Secret Service, is an executive department.

The term "agency" includes any department, independent establishment, commission, administration, authority, board, or bureau of the United States.

The term "law enforcement officer" means any officer or employee of the United States or the District of Columbia while engaged in the enforcement or prosecution of any criminal laws of the United States or the District of Columbia.

<u>Attempt</u>

In Count 1, the defendant is also charged with attempt to commit the crime of obstructing officers during a civil disorder.   An attempt to obstruct officers during a civil disorder is a federal crime even if the defendant did not actually complete the crime of obstructing officers during a civil disorder.

In order to find the defendant guilty of attempt to commit the crime of obstructing officers during a civil disorder, the Court must find that the government proved beyond a reasonable doubt each of the following two elements:

1. the defendant intended to commit the crime of obstructing officers during a civil disorder.

2. the defendant took a substantial step toward committing the crime of obstructing officers during a civil disorder, which strongly corroborates or confirms that the defendant intended to commit that crime.

## Counts 2 and 3: Assaulting, Resisting, or Impeding Certain Officers using a Deadly or Dangerous Weapon

In the second and third counts of the Indictment, the defendant is charged with assaulting, resisting, opposing, or impeding certain officers using a deadly or dangerous weapon, in violation

of 18 U.S.C. § 111(a)(1) and (b).  In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. the defendant assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer of the United States.

2. the defendant did such acts forcibly.

3. the defendant did such acts voluntarily and intentionally.

4. the officer was then engaged in the performance of official duties.

5. in doing such acts, the defendant intentionally used a deadly or dangerous weapon.

The term "forcibly" means that the defendant used force, attempted to use force, or threatened to use force against the officer.  A threat to use force at some unspecified time in the future is not sufficient to establish that the defendant acted forcibly.

The term "assault" means any intentional attempt or threat to inflict injury upon someone else, when coupled with an apparent present ability to do so.

The terms "resist," "oppose," "impede," "intimidate," and "interfere with" carry their everyday, ordinary meanings.

The term "intentionally" means that the defendant knowingly, consciously, and voluntarily committed an act which the law makes a crime. This general intent may be inferred from the doing of the act.

"Knowingly" has the same meaning as provided above under Count 1.  The government does not have to prove that the defendant knew that the victim was a federal officer.

It is not necessary to show that the defendant knew the person being forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with was, at that time, carrying out an official duty so long as it is established beyond a reasonable doubt that the person was, in fact,

carrying out an official duty and that the defendant intentionally forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with that officer.

An object is a "deadly or dangerous weapon" if it is capable of causing serious bodily injury or death to another person and the defendant used it in that manner. In determining whether the object is a "deadly or dangerous weapon," the Court may consider both physical capabilities of the object used and the manner in which the object is used.

In Counts 2 and 3, the defendant is also charged with felony assaulting, resisting, opposing, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1). In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. the defendant assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer of the United States.

2. the defendant did such acts forcibly.

3. the defendant did such acts voluntarily and intentionally.

4. the officer was then engaged in the performance of official duties.

5. the defendant made physical contact with an officer of the United States who was then engaged in the performance of official duties, **or** acted with the intent to commit another felony.

For purposes of the fifth element, "another felony" refers to the offense charged in Count 1 (civil disorder), or the felony offense charged in Count 4 (entering and remaining on a restricted building or grounds with a deadly or dangerous weapon), Count 5 (disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon), or Count 6

(engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon).

**Count 4: Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon**

The fourth count of the Indictment charges the defendant with entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A).  In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1.  the defendant entered or remained in a restricted building or grounds without lawful authority to do so.

2.  the defendant knew that the building or grounds was restricted and he knew that he lacked the lawful authority to enter or remain there.

3.  the defendant knowingly used or carried a deadly or dangerous weapon during and in relation to the offense.

The term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is temporarily visiting.

The term "person protected by the Secret Service" includes the Vice President and the immediate family of the Vice President.

The term "knowingly" has the same meaning described in the instruction for Count 1 and the term "deadly or dangerous weapon" has the same meaning described in the instructions for Counts 2 and 3.

If the Court does not find that the defendant knowingly used or carried a deadly or dangerous weapon during and in relation to this offense, the Court may find the defendant guilty

14

of entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) if the Court finds that the first two elements described above are met beyond a reasonable doubt.

## Count 5: Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

The fifth count of the Indictment charges the defendant with disorderly or disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A).  In order to find the defendants guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. the defendant knowingly engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds.

2. the defendant did so with the intent to impede or disrupt the orderly conduct of Government business or official functions.

3. the defendant's conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

4. the defendant knowingly used or carried a deadly or dangerous weapon during and in relation to the offense.

"Disorderly conduct" occurs when a person acts in such a manner as to cause another person to be in reasonable fear that a person or property in a person's immediate possession is likely to be harmed or taken, uses words likely to produce violence on the part of others, is unreasonably loud and disruptive under the circumstances, or interferes with another person by jostling against or unnecessarily crowding that person.

"Disruptive conduct" is a disturbance that interrupts an event, activity, or the normal course of a process.

15

The terms "restricted building or grounds," "knowingly," and "deadly or dangerous weapon" have the same meanings described previously.

If the Court does not find that the defendant knowingly used or carried a deadly or dangerous weapon during and in relation to this offense, the Court may find the defendant guilty of disruptive and disorderly conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) if the Court finds that the first three elements described above are met beyond a reasonable doubt.

## Count 6:  Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

The sixth count of the superseding Indictment charges the defendant with engaging in an act of physical violence in a restricted building or grounds while using or carrying a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A).  In order to find the defendant guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1. the defendant engaged in physical violence against a person or property in, or in proximity to, a restricted building or grounds.

2. the defendant knew the building/grounds was restricted and that he lacked authority to remain there.

3. the defendant knowingly used or carried a deadly or dangerous weapon during and in relation to the offense.

The terms "knowingly" and "restricted building or grounds" have the same meanings described previously.

The term "act of physical violence" means any act involving an assault or other infliction or threat of infliction of death or bodily harm on an individual, or damage to, or destruction of, real or personal property.

If the Court does not find that the defendant knowingly used or carried a deadly or dangerous weapon during and in relation to this offense, the Court may find the defendant guilty of engaging in physical violence in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(4) if the Court finds that the first two elements described above are met beyond a reasonable doubt.

## Count 7:  Act of Physical Violence in the Capitol Grounds or Buildings

The seventh count of the Indictment charges the defendant with engaging in an act of physical violence in the Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F). In order to find the defendant guilty of this offense, you must find that the government proved each of the following elements beyond a reasonable doubt:

1. the defendant engaged in an act of physical violence in the United States Capitol Grounds.

2. the defendant acted willfully and knowingly

The term "act of physical violence" means any act involving an assault or other infliction or threat of infliction of death or bodily harm on an individual, or damage to, or destruction of, real or personal property.

The term "United States Capitol Grounds" includes the United States Capitol located at First Street, Southeast, in Washington, D.C.

A person acts "willfully" if he acts with the intent to do something that the law forbids, that is, to disobey or disregard the law. "Willfully" does not, however, require proof that the defendant be aware of the specific law or rule that his conduct may be violating.

The term "knowingly" has the same meaning provided previously.

## IV.    THE PARTIES' EVIDENCE AND ANTICIPATED DEFENSES

The government has met and conferred with defense counsel about the evidence it plans to present.  Based on those discussions, the government expects that nearly all of its evidence will be admitted without objection, and that any remaining objections can be resolved quickly before the government begins its case in chief.  Likewise, based on defense counsel's representations about their plans for trial, the government expects that it would not object to the defendant's exhibit.[3] The government may nonetheless object to particular questions about exhibits.

The government anticipates that the defense will focus on: (1) whether the defendant committed multiple assaults; and (2) whether the defendant used and carried a deadly or dangerous weapon in the course of assaulting Officers Riggleman and Williams.  The defendant may also try to argue that his conduct was provoked by the police, though the defense has not asked for a self-defense or defense-of-others instruction.

Officer Riggleman and Williams were sprayed by Ramey.  Both sprays were captured on video.[4]  Ramey's spray of Officer Riggleman can be seen leaving the canister in Ramey's hand and the liquid is visible going directly onto Officer Riggleman's face (government exhibit 200A).

---

[3]    The defense shared with the government an unclipped video that the defense intended to introduce as an exhibit.  The government and counsel for the defendant conferred and agreed, if the video was clipped and appropriately tailored to the facts of this case, the government would not object to its admission.  The government has not seen the final clipped exhibit, and therefore reserves the right to object to the defendant's exhibit on Rule 401 or 403 grounds.

[4]    Government's exhibits 200, 208, 211, and 216 all show the assaults from multiple angles.

Seconds later, Ramey can be seen pointing his canister at and spraying towards Officer Williams (government exhibit 200B).  Although there are other sprays in the vicinity, this is the only spray in the direction of Officer Williams and Officer Williams can be seen reacting to Ramey's spray.

Although the government will prove Ramey sprayed both Officer Riggleman and Officer Williams, it is not legally required to do so to prove Ramey guilty of a violation of 18 U.S.C. § 111(b).  Based on the jury instructions provided by the Court and case law, the government must prove five elements beyond a reasonable doubt to prove a violation of Section 111(b):

1. First, the defendant assaulted, resisted, opposed, impeded, intimidated, or interfered with an officer of the United States.
2. Second, the defendant did such acts forcibly.[5]
3. Third, the defendant did such acts voluntarily and intentionally.
4. Fourth, the officer was then engaged in the performance of official duties.
5. Fifth, in doing such acts, the defendant intentionally used a deadly or dangerous weapon.

ECF 28 at 5-6, 35, 37.  The government is not required to prove a battery.

One of the six verbs the government may rely on to prove a violation of Section 111(b) is "assaulted."  An assault is defined by the Court as:

> The term "assault" means any intentional attempt or threat to inflict injury upon someone else, when coupled with an apparent present ability to do so.  A finding that one used force (or attempted or threatened to use it) isn't the same as a finding that he attempted or threatened to inflict injury.  In order to find that the defendant committed an "assault," you must find beyond a reasonable doubt that the defendant acted forcibly and that the defendant intended to inflict or intended to threaten injury.

ECF 28 at 6; *see United States v. Brown*, No. 21-MJ-565 (ZMF), 2021 WL 4033079, at *6 (D.D.C. Sept. 3, 2021), *aff'd*, No. 21-3063, 2021 WL 5537705 (D.C. Cir. Nov. 17, 2021) ("Brown's mere wielding of pepper spray toward officers satisfies the elements of [18 U.S.C. § 111(a)(1), (b)] for which the use of a dangerous weapon is relevant.").  Ramey's assaults of Officer Riggleman and

---

[5]     "The term 'forcibly' means that the defendant used force, attempted to use force, or threatened to use force against the officer.  ECF 28 at 6.

Officer Williams, whether a battery or an attempted battery, constitutes an assault and a violation of Section 111(b).

Moreover, though the government asserts that the evidence will show beyond a reasonable doubt that Ramey assaulted both officers, "assaulted" is only one of six verbs by which a defendant may violate 18 U.S.C. § 111.  Even if the Court finds that Ramey's acts in spraying both officers did not constitute an assault, the evidence will show that he also "resisted, opposed, impeded, intimidated, or interfered" with officers of the United States.

The spray used by Ramey on Officers Riggleman and Williams was a dangerous or deadly weapon.  "For an object that is not inherently deadly . . . the object must be <u>capable</u> of causing serious bodily injury or death to another person and the defendant must use it in that manner." *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002) (emphasis added); *see also United States v. Loman,* 551 F.2d 164, 169 (7th Cir. 1977) (finding a walking stick to be a dangerous weapon even if it did not cause grave bodily injury because of the manner in which it was used).  Evidence will show that pepper spray is capable of being lethal or causing serious bodily injury.  Ramey sprayed both officers on their face, incapacitating them while they were surrounded by a surging mob of rioters.  Based on the capabilities of pepper spray, the similarities of the liquid sprayed by Ramey to pepper spray, the circumstances surrounding the spray, and the effects on the officers, the liquid sprayed by Ramey was a deadly or dangerous weapon.

## V.    CONCLUSION

The defendant, Barry Ramey, joined the mob of rioters that attacked the U.S. Capitol building and grounds on January 6, 2021.  Ramey's assaults, with a weapon, on Officers Riggleman and Williams risked serious bodily injury to those officers and, in no small part, facilitated the first interior breach of the Capitol building.  Beyond his assaults, Ramey's extended

presence on Capitol grounds during this civil disorder, as part of the mob, interfered with law enforcement's ability to do their job and secure the Capitol building.  At trial, the evidence will prove that Ramey acted knowingly, voluntarily, and intentionally in entering the restricted grounds of the Capitol and violently attacking Capitol police with a deadly or dangerous weapon.  The government will prove the charged offenses beyond a reasonable doubt.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:        /s/
Kathryn E. Fifield
Brian D. Brady
Trial Attorneys
U.S. Department of Justice, Crim. Div.
Detailed to the D.C. U.S. Attorney's Office
601 D St. NW
Washington, D.C. 20530
Kathryn.fifield@usdoj.gov
(202) 320-0048